**THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **JAY OTERO,** | **:** | |
| | **:** | |
| **Plaintiff,** | **:** | |
| | **:** | **Civil Action** |
| **v.** | **:** | **No. 5:07-cv-405 (CAR)** |
| | **:** | |
| **GEORGE R. VITO, *et al.*,** | **:** | |
| | **:** | |
| **Defendants.** | **:** | |
| _____ | **:** | |

### *ORDER ON MOTION FOR SUMMARY JUDGMENT*

Plaintiff has moved the Court to issue a partial summary judgment finding that the following Defendants are "sham entities" acting as the nominees and/or alter egos of Defendant in *fi. fa.* George R. Vito ("Dr. Vito"):

Foot & Leg Centers of America, P.C.; FLCG, Inc.; Surgical Centers of Georgia, P.C.; A.S.A.M.I.-L.E., Inc.; GRV Irrevocable Trust; Tubone Irrevocable Trust; Medical Shoe Company, LLC; L & V Properties, LLC; EOI, LLC; Georgia Foot & Ankle Society, Inc.; SFTA, Inc.; SEBE, LLC; Business Solution Professionals, LLC; JRGG, LLC; Business Security Consultants, LLC; Identical Brothers, LLC; Lee, LLC; SLP Professionals, LLC; and M.M. America, LLC.

(Collectively, "the Vito Entities"). The motion is unopposed by Defendants, except as to the entity Identical Brothers, LLC.

Upon review of the arguments of counsel and the evidence in the record of this case, the Court finds that there is no genuine issue of material fact and that Plaintiff is entitled to judgment as a matter of law. The undisputed evidence shows that the Vito Entities, with the possible

exception of Identical Brothers, LLC, were alter egos of Dr. Vito, used to defeat justice and evade contractual or tort responsibilities.[1]  Under Georgia law, however, the Court is not authorized to exercise the equitable power of piercing the corporate veil in a case on behalf of a creditor who seeks to recover from a corporate entity for the debts of one its principals.  Instead, the Court's finding that these entities were alter egos of Defendant George R. Vito pertains to Plaintiff's claim that any transfers by Vito to the Vito Entities were fraudulent and voidable under Georgia law. Plaintiff is entitled to judgment as a matter of law as to those entities.  Accordingly the Motion for Summary Judgment [Doc. 276], as amended [Doc. 284], is **GRANTED**, except as it pertains to Identical Brothers, LLC.

1.      **The Defendant business entities are alter egos of Dr. George R. Vito**

        The evidence in this case, developed with great difficulty, shows that the various corporate and business entities listed above were alter egos created and controlled by George R. Vito ("Dr. Vito") as part of an elaborate scheme to evade liabilities to judgment creditors such as the Plaintiff in this case.  To establish that a corporation or other business entity is the alter ego or business conduit of its owner, there must be evidence that the owner or owners of the business have abused the corporate form for illegitimate purposes.  The evidence must show three things: "[1] that the stockholders' disregard of the corporate entity made it a mere instrumentality for the transaction of their own affairs; [2] that there is such unity of interest and ownership that the separate personalities of the corporation and the owners no longer exist; and [3] [that] to adhere to the doctrine of corporate entity would promote injustice or protect fraud." Derbyshire v. United Builders Supplies, Inc., 194 Ga.App. 840, 844 (1990) (quoting Trans-American Communications v. Nolle, 134 Ga.

_____

[1]As to Identical Brothers, LLC, there remain genuine  issues of material fact that preclude summary judgment at this stage.

App. 457, 460 (1975)).  Adherence to the doctrine of corporate entity promotes injustice or protects fraud where the evidence shows "that the corporate arrangement was a sham, used to defeat justice, to perpetrate fraud or to evade statutory, contractual or tort responsibility."  Id.

In this case, evidence of the nature and purpose of the scheme comes from two sources.  The most important source is the affidavit of Dr. Vito, who concedes that he created and controlled the various entities so that he could protect his assets from collection while maintaining control over and access to those assets.  The second source of evidence is the record developed during the numerous proceedings related to Plaintiff's motion for preliminary injunction, the appointment of a receiver, and the finding of civil contempt.  Evidence presented by the Plaintiff on motion for preliminary injunction shows that Dr. Vito, his brothers Richard C. Vito and John A. Vito, and his father George A. Vito were the official owners, shareholders, and officers of all the entities.  In a show cause hearing on August 20, 2008, Richard Vito and John Vito both testified that they had no knowledge of or involvement in the affairs of these entities, but that they agreed to participate as owners or officers of the various entities at the direction of their brother.  This testimony confirms the admission in Dr. Vito's affidavit that he used the names of his brothers and father in the various entities, but retained control over them.  Finally, extensive documentary evidence presented by the Plaintiff shows that the various business entities were used primarily to carry out the personal business of Dr. Vito.

George R. Vito has summarized the nature of his scheme in an affidavit he executed on February 9, 2009, as a partial resolution of the discovery disputes that led to his sanction for civil contempt.  In his affidavit he explains that he designed a layered system of corporations, limited

liability companies, and trusts to operate his personal and business affairs, in a deliberate strategy to put his assets out of the reach of his creditors without losing control of those assets. He testifies:

> In an effort to protect my personal assets from attachment by creditors, including but not limited to Jay Otero, I devised several strategies including the use of layered Corporations, Limited Liability Companies (LLCs) and Trusts and the use of the names of my brothers (John A. Vito and Richard C. Vito) and my father (George A. Vito) to transfer assets away from my name and through or into the names of nominee entities, over which entities, I retained control. The entities included but may not be limited to Foot & Leg Centers of Georgia, P.C., Foot & Leg Centers of America, P.C., FLCG, Inc., Surgical Centers of Georgia, P.C., Medical Personnel Services, Inc., A.S.A.M.I.-L.E., Inc., GRV Irrevocable Trust, Tubone Irrevocable Trust, Medical Shoe Company, LLC, L & V Properties, LLC, EOI, LLC, Georgia Foot & Ankle Society, Inc., SFTA, Inc., SEBE, LLC, Business Solution Professionals, LLC, JRGG, LLC, Business Security Consultants, LLC, Identical Brothers, LLC, Lee, LLC, SLP Professionals, LLC, and M.M. America, LLC. The strategies involved using loans and security agreements to tie up accounts receivable, using proceeds from loans to purchase annuities and real property, and using cash flow from the businesses to repay the loans creating equity in the real property and cash value in the annuities. The primary entities for revenue generation were Foot & Leg Centers of Georgia, P.C., and Surgical Centers of Georgia, P.C.

Vito Aff. ¶ 2 (Doc. 271 Ex. 1). Dr. Vito explains that he not only created this complex structure of business entities, but also engaged in complex transactions among and through those entities with

the ultimate goal of maintaining control over his assets while removing them from the reach of creditors such as Plaintiff.  The admissions in Dr. Vito's affidavit establish that the Vito entities were a mere instrumentality for the transaction of Dr. Vito's affairs and that there was a complete unity of interest and ownership between Dr. Vito and the Vito entities, such that the separate personalities of the entities and their *de facto* owner did not exist

The admissions in Dr. Vito's affidavit, sufficient in themselves to support an *alter ego* finding, are also consistent with the record of evidence developed during the long and contentious history of this case.  The pleadings and evidence presented by Plaintiff in connection with his motion for preliminary injunction show that Dr. Vito, his father, and his brothers were on record as the owners and officers of the various business entities.  Richard Vito and John Vito testified, however, that they had no knowledge of or involvement in the activities of the businesses, but simply allowed their brother to use their names on official documents.  Other evidence presented by the Plaintiff, the Special Master, and the Receiver, has shown that the various business entities were operated for the personal benefit of Dr. Vito.

The Answers of the various Defendant business entities show that the official principals of all the entities were Dr. Vito, his brothers, and his father, with a single exception (Georgia Foot & Ankle Society, Inc.).  Defendant Foot & Leg Centers of Central Georgia, P.C., admitted that Dr. Vito was its sole board member, John Vito was its CEO, and Richard Vito was its CFO.  Doc. 47 ¶¶ 76, 78, 79.  Defendant FLCG, Inc., admitted that John Vito was its CEO and Secretary and that Richard Vito was its CFO.  Doc. 46 ¶¶ 82, 88.  Defendant Surgical Centers of Georgia, P.C., admitted that John Vito was its CEO and that Richard Vito was its Secretary.  Doc. 51 ¶¶ 110, 106.  Defendant A.S.A.M.I.-L.E., Inc., admitted that John Vito was its CEO and CFO, and that Richard

Vito was its Secretary.  Doc. 44 ¶¶ 145-46.  Defendant GRV Irrevocable Trust admitted that its settlor was George R. Vito and that its trustee was George A. Vito.  Doc. 67 ¶¶ 157-58.  Defendant Tubone Irrevocable Trust admitted that its trustee was George A. Vito. Doc. 67 ¶ 186.  Defendant SFTA, Inc. admitted that George R. Vito was originally the sole owner of its 100 outstanding shares, and that he later transferred 48 shares to Richard Vito and 48 shares to John Vito.  Doc. 55 ¶ 219. It also admitted that Defendants Surgical Centers of Georgia, P.C., and Foot & Leg Centers of America, P.C., were wholly-owned subsidiaries of SFTA, Inc. Doc. 55 ¶ 222.  Defendant Georgia Foot & Ankle Society, Inc., admitted that George R. Vito was its president and incorporator.  Doc. 56 ¶ 202. It is the sole exception among the business entities, in that it listed one officer who was not a member of the Vito family, Dr. Larry Goldstein, as its treasurer or CFO.  Doc. 56 ¶ 205.

The ownership and management of the Defendant limited liability companies is not well-established in the record.  The Secretary of State of Georgia does not maintain public records of the ownership and management of LLCs and Defendants have not been fully cooperative in the discovery process.  What is known about these entities, however, confirms Dr. Vito's admission that they were part of his strategy to maintain control of assets while shielding them from creditors. Defendant Business Solution Professionals, LLC, admitted that it was wholly owned and managed by George R. Vito.  Doc. 42 ¶ 231.  Defendant Medical Shoe Company, LLC, admitted that it was formed by Richard Vito and John Vito in March 2004.  Doc. 50 ¶ 165.  It also admitted that its registered address was Dr. Vito's office in Macon, Georgia, although its registered agent was Richard Vito, a resident of Rochester, New York.  Doc. 50 ¶ 166.  Defendant L & V Properties, LLC, admitted that its registered address was Dr. Vito's office in Macon, Georgia, and stated that it merged with Defendant EOI, LLC, on August 5, 2004.  Doc. 66 ¶¶ 170, 173.  In supplemental

interrogatory responses submitted in an effort to purge himself of civil contempt, Dr. Vito stated that his father, George A. Vito, was the manager of L & V Properties, and that the company was formed to hold title to properties owned by George R. Vito.  Doc. 215 Ex. 15 pp. 10-11.  The supplemental interrogatory responses further state that EOI was owned by the Tubone Irrevocable Trust.  Id.

In support of his motion for preliminary injunction, Plaintiff submitted substantial documentary evidence that has never been challenged by Defendants.  This evidence provides further insight into the ownership and activities of the business entities, particularly EOI and L & V Properties.  An "Assignment of Assignee Interest" document dated August 13, 2004, shows that George A. Vito, as trustee of the Tubone Irrevocable Trust, transferred a one percent interest in EOI to John A. Vito.  Doc. 103 Ex. 17.  The Operating Agreement of EOI, LLC, shows that L & V Properties was merged into EOI as of August 13, 2004, and that EOI was to be the surviving entity.  Doc. 103 Ex. 19.

Although Dr. Vito's brothers and father were registered as officers or shareholders of most of the Vito entities, the undisputed evidence in this case establishes that Dr. Vito himself had sole and complete control of all the Vito Entities.  The use of his brothers' and father's names as shareholders, owners, trustees, or officers was a formality and a pretense.  Both Richard Vito and John Vito denied any knowledge of or participation in the affairs of any of the entities.  During a show cause hearing on August 20, 2008, Richard Vito testified that he was generally aware that he was a co-owner or officer of various business entities, but stated that he was not sure of the capacity or extent of his involvement in them.  Transcript, Doc. 226 p. 4.  He did not know the purpose or function of the entities, but only became involved because Dr. Vito asked him to.  Id. at 9.  At the August 20 hearing he learned for the first time that he was the owner of 48 shares of SFTA, Inc.  Id.

at 13.  John Vito also testified at the August 20 hearing, stating that he had no involvement with the activities of the various entities in which he was named and knew nothing of their business.[2] Richard Vito testified that he gave his brother a signature stamp to use in paying bills.  Id. at 7.  John Vito was not specifically aware of a signature stamp of his signature, but noted that his signature was on checks that he did not sign himself.  George A. Vito, the father of Dr. Vito and his two brothers, has never appeared before the Court or submitted any affidavit.  However, the parties have represented to the Court that George A. Vito is elderly and incapacitated.  Richard Vito testified that his father was quadriplegic as a result of a medical procedure in 2000.  Id. at 5.

In addition to evidence showing that the Vito Entities were purely alter egos and business conduits of Dr. Vito, there is also undisputed evidence to show that the entities were a mere instrumentality for the transaction of Dr. Vito's own affairs and that there was such a unity of interest and ownership among the various entities and Dr. Vito that the separate personalities of the businesses and their owner no longer existed.  The evidence in the record shows that the entities served no purpose other than to channel Dr. Vito's property and the income from Dr. Vito's podiatric practice through various conduits that would be, theoretically, outside the reach of Dr. Vito's creditors.

One primary purpose of the various entities was to place legal title to Dr. Vito's real estate holdings and personal property in the name of third parties.  L & V Properties was the record owner of Dr. Vito's offices on Riverside Drive in Macon, of a condominium in Rochester, New York, and of other real property in Monroe County, Milledgeville, and Warner Robins, Georgia,.  Doc. 103 Exs. 9-16.  EOI was the record owner of Dr. Vito's personal residence at 181 Rivoli Drive in Macon,

---

[2]The transcript of John Vito's testimony has not been made a part of the record.  The Plaintiff is hereby directed to supplement the record with a copy of that transcript.

Georgia.  Doc. 103 Ex. 21.  EOI or L & V Properties also purchased personal property for use by

Dr. Vito and his family members.  In his supplemental interrogatory responses, Dr. Vito states that

EOI leased or owned "a number of motor vehicles . . . for use by George R. Vito, Richard C. Vito,

and – at times – John A. Vito.   Doc. 215 Ex. 15 p. 11.  These vehicles included a 2007 Toyota, a

2008 Volvo, and a 2007 Volvo station wagon.  Id. at 12.  Evidence produced by Plaintiff shows that

at least two other vehicles were purchased in the name of L & V Properties.  A certificate of title

document shows that L & V Properties was registered as the co-owner, with Dr. Vito, of a 2006

Chevrolet Trailblazer, even though L & V Properties officially merged with EOI, LLC in 2004.

Doc. 103 Ex. 7.  On the credit application for the vehicle, Dr. Vito stated that he was employed by

L & V Properties as its president, at a salary of $125,000.  Id.  L & V Properties also purchased a

new Cadillac Escalade in 2005, at a purchase price of $61,829.12.  Doc. 103 Ex. 8.

    The Vito Entities were also used to pay Dr. Vito's personal expenses.  Bank account records

produced by the Plaintiff on his motion for preliminary injunction show that expenses for several

of the business entities and personal expenses of Dr. Vito were paid out of a single account operated

by his bookkeeper, Lorea Sheffield.  Sheffield opened an account at Robins Federal Credit Union

under the name "Lorea Sheffield Accounting Services," into which she deposited checks from Foot

& Leg Centers of Georgia, P.C., or from SFTA, Inc.  Sheffield Dep. 45-46 (Doc. 107).[3]  Account

records from this account show that funds obtained from Foot & Leg Centers of Georgia were used

to pay personal expenses for Dr. Vito and his girlfriend, Stacy Pieri.  For example, checks from

Sheffield's Robins FCU account were issued to pay country club dues and purchase a pair of

---

[3]In his supplemental interrogatory responses, Dr. Vito stated that funds from Foot & Leg Centers of
Georgia were submitted to Sheffield, whereas funds from Surgical Centers of Georgia were submitted to another
bookkeeper, Rhonda Ballenger.  Doc. 215 ex. 15 p. 6.

earrings on Dr. Vito's behalf.  Id.   Funds were also used on behalf of Pieri to pay for a personal trainer and for rug cleaning.  Id.  Funds were used on behalf of EOI to purchase furniture for Dr. Vito's home and to pay *ad valorem* taxes on a Harley Davidson motorcycle.  Id.  Funds attributed to Foot & Leg Centers of America were used to pay for a trip to Russia and to pay a credit card bill that included charges for a cruise.  Id.  The records produced by Plaintiff show that Sheffield also used the account to pay a bill for a credit card held by SFTA, Inc.  Id.  Dr. Vito has stated that he obtained credit cards through SEBE, Business Solution Professionals, SFTA, and EOI, and that he used these cards to pay his personal expenses.   Doc. 215 Ex. 15 p. 20.

The records from the Robins FCU account show that income from Dr. Vito's podiatry practice was used to maintain his other corporate entities as well, and that their business affairs were thus commingled.  Checks from the account were used to pay the expenses of Foot & Leg Centers of Georgia, P.C., L & V Properties, LLC, Foot & Leg Centers of America, P.C., EOI, LLC, Surgical Centers of Georgia, P.C., Tubone Irrevocable Trust, Medical Shoe Company, LLC, Georgia Foot & Ankle Society, Inc., IFT, LLC, SFTA, Inc., JRGG, LLC, and Identical Brothers, LLC.  Doc. 103 Ex. 26.  On behalf of these entities, Sheffield paid expenses such as ad valorem taxes on real and personal property, mortgage payments, legal and accounting bills, corporate registrations, and insurance premiums.  Id.

Given the complete unity of interest between Dr. Vito and the Vito entities, to adhere to the doctrines of corporate identity would promote injustice in this case.  Dr. Vito has conceded that he conceived the various business entities in this case as a strategy to place his personal assets and income out of the reach of his creditors, including the Plaintiff.  He has consistently used these business entities as his alter ego and as an instrumentality for his own affairs, attempting to continue

to enjoy the use of his personal resources while shielding himself from responsibility for his liabilities.  The equitable doctrines of piercing the corporate veil would normally apply to allow creditors to consider the assets of the Vito Entities to be assets of Dr. Vito.  As will be discussed below, however, the circumstances of this case may not permit equitable veil-piercing under current Georgia law.  Nevertheless, the evidence supporting the Court's finding that the Vito Entities were alter egos of Dr. Vito also supports legal remedies under Georgia's Uniform Fraudulent Transfers Act, and warrants the granting of summary judgment in this case.

2.    **Dr. Vito's transfers to the Defendant business entities were fraudulent and voidable.**

Although the undisputed evidence establishes that the Vito Entities were alter egos of Dr. Vito, precedent suggests that this case should be reviewed under the statutory law of fraudulent transfers rather than under the equitable doctrine of corporate veil-piercing.  The Georgia Supreme Court has held that Georgia law does not recognize "reverse veil-piercing," that is, piercing of the veil "to the extent that it would allow an 'outsider,' such as a third-party creditor, to pierce the veil in order to reach a corporation's assets to satisfy claims against an individual corporate insider." Acree v. McMahan, 27 ga. 880,881 (2003).  The decision in Acree seems to foreclose veil-piercing in this case, given that Plaintiff is an outside, third-party creditor seeking to satisfy claims against Dr. Vito out of the assets of corporations and business entities in which he is an insider.  In such cases, the Supreme Court has held, legal rather than equitable remedies should be sufficient.  Taking a sentence from the Tenth Circuit's decision in Cascade Energy and Metals Corp. v. Banks, 896 F.2d 1557, 1577(10th Cir. 1990), the court states:

> we are inclined to conclude that more traditional theories of conversion, fraudulent
>
> conveyance of assets, respondeat superior, and agency law are adequate to deal with

situations where one seeks to recover from a corporation for the wrongful conduct committed by a controlling stockholder without the necessity to invent a new theory of liability.

Acree, 276 Ga. at 882.[4]  The court in Acree further notes that normal judgment-collection procedures also allow a judgment creditor to attach the judgment debtor's shares in the corporation rather than the corporation's assets.  Id.

The evidence cited above to show that the business entities were alter egos of Dr. Vito is also sufficient to show that the transfers of money, real property, and personal property from Dr. Vito to those entities were fraudulent under the Georgia Uniform Fraudulent Transfers Act, O.C.G.A. § 18-2-70, et seq. ("UFTA").  The UFTA provides a creditor with several remedies against a fraudulent transfer, including avoidance of the transfer to the extent necessary to satisfy the creditor's claim and attachment against the asset transferred or other property of the transferee. O.C.G.A. § 18-2-77.  Under the UFTA, a transfer is "fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation with actual intent to hinder, delay, or defraud any creditor of the debtor."  O.C.G.A. § 18-2-74(a).  Normally, the plaintiff's primary challenge in a fraudulent transfer case is to prove actual intent to hinder, delay, or defraud.

In this case, proof of actual intent is established by the admission of Dr. Vito in his Feb 9, 2009 affidavit.  In his affidavit he explains that "the use of layered Corporations, Limited Liability Companies (LLCs) and Trusts and the use of the names of my brothers (John A. Vito and Richard C. Vito) and my father (George A. Vito)" was part of a coordinated strategy to protect personal

---

[4]The Court's alter ego findings may also support remedies under a theory of agency law, but Plaintiff has not pled and agency theory and this Order will not explore agency theories.

12

assets from attachment by creditors, including Plaintiff.  Vito Aff. ¶ 2 (Doc. 271 Ex. 1).  The strategy was to use the various business entities to transfer assets away from his own name and through or into the names of nominee entities, while retaining complete control over those assets. In addition to transferring assets into these entities, Dr. Vito incurred obligations, "using loans and security agreements to tie up accounts receivable, using proceeds from the loans to purchase annuities and real property, and using cash flow from the businesses to repay the loans creating equity in the real property and cash value in the annuities." Id.  Based on Dr. Vito's admission, the Court can conclude that there is no genuine issue of material fact and Plaintiff is entitled to judgment as a matter of law finding that any transfers from Dr. Vito to the Vito Entities were fraudulent under the UFTA.

As to any transfers that occurred prior to July 1, 2002, the same evidence is also sufficient to support avoidance under Georgia's prior fraudulent transfer law, O.C.G.A. § 18-2-22.  The prior law, repealed as of July 1, 2002, provided that "[e]very conveyance of real or personal property, by writing or otherwise, and every bond, suit, judgment and execution, or contract of any description had or made with the intention to delay or defraud creditors, where such intention was known to the taking party," shall be "null and void" as to creditors "and others." O.C.G.A. § 18-2-22(2) (repealed by Ga. L. 2002. p. 141 § 2, effective July 1, 2002).   The repeal of the statute on July 1, 2002, "did not extinguish causes of action that arose under O.C.G.A. § 18-2-22 before that date." Gerschick v. Pounds, 281 Ga. App. 531, 533 n. 8 (2006).  The evidence in Dr. Vito's affidavit is sufficient to establish that Dr. Vito, as transferor, had the requisite intent to delay or defraud creditors.  Because the transferees were alter egos under the complete control of Dr. Vito, the evidence also establishes that Dr. Vito's intent was known to the transferees.  Where the requisite intent has been established,

the prior fraudulent conveyance law has been held to apply as to creditors who were not yet actual creditors of the transferor at the time of the transfer, such as Plaintiff in this case.  Id. at 533.

The Court reiterates that the admissions in Dr. Vito's affidavit are entirely consistent with all other evidence produced in this case.  Even in the absence of the admissions in the affidavit, the undisputed evidence, considered in light of the specific factors set forth in the UFTA, establishes that the transfers to the entities and the obligations incurred by the entities were fraudulent.  The UFTA outlines eleven factors that may be considered as indications of actual intent to defraud.  In determining intent, the finder of fact may consider whether:

(1) The transfer or obligation was to an insider;

(2) The debtor retained possession or control of the property transferred after the transfer;

(3) The transfer or obligation was disclosed or concealed;

(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) The transfer was of substantially all the debtor's assets;

(6) The debtor absconded;

(7) The debtor removed or concealed assets;

(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

14

At O.C.G.A. § 18-2-74(b).  At least five of these factors are relevant in this case.  First, the evidence shows that the transfers involved were to insiders.  Second, the evidence shows that Dr. Vito retained control of his assets after transferring them to his alter ego business entities.  Third, the transfers were made at time when Dr. Vito had already been sued or threatened with suit.  Fourth, the transfers involved substantially all of Dr. Vito's assets.  Fifth, Dr. Vito has made every effort to conceal his assets from discovery by Plaintiff or the Court.

As to the first consideration, all of the Vito Entities were insiders as to Dr. Vito, in that they were his alter egos.  The UFTA's definition of "insider" includes relatives of the debtor, partnerships in which the debtor is a general partner, and corporations of which the debtor is a director, officer, or person in control.  O.C.G.A. § 18-2-71(7).  All evidence produced in this case shows that Dr. Vito had complete control of the Vito Entities, with the possible exception of Identical Brothers.[5]  To the extent that others were named as officers or directors of the entities, they were themselves insiders, Dr. Vito's brothers and his father.

Second, because Dr. Vito had constant control of all the Vito Entities, the evidence shows that he retained possession and control of the property transferred after the transfer.  As noted above, the evidence produced by Plaintiff showed that Dr. Vito paid his personal expenses through accounts held by the entities.  He has stated in discovery that all of the money collected through his podiatry practice was deposited into accounts held by the entities and was used to pay salaries, expenses of the practice, and his personal expenses.  Doc 215 Ex. 15at 6.  He also used credit cards from at least four of the entities to pay his personal expenses.  Id. at 20.  His personal residence and his personal

---

[5]As to Identical Brothers, there is evidence to indicate that Richard Vito may have had substantial control and may have pursued legitimate business activities independent of his brother's interests.  There is also evidence to indicate that Dr. Vito made fraudulent transfers to Identical Brothers.  This conflict in evidence establishes genuine issues of material fact.

vehicles were owned by the entities.  His brothers, who were generally registered as the officers of the entities, testified that they had no control of or influence on the activities of any of the entities, but simply did as they were directed by Dr. Vito.

Third, the evidence also shows that at the time the Vito entities were created, and before the transfers at issue in this case were made, Dr. Vito had already been sued or threatened with suit. Evidence in this case indicates that the scheme of fraudulent transfers was initiated on July 26, 2001, with the creation of the GRV Irrevocable Trust.  Plaintiff Otero's underlying RICO action against Dr. Vito was not filed until July 7, 2004.  Prior to the filing of this case, however, Dr. Vito had been sued numerous times, including at least four other suits for injuries from leg-lengthening procedures, similar to the claims in Plaintiff's underlying action.  Evidence of these suits was presented to the Court in the underlying case.  The first of these suits was filed in the Court of Common Pleas for Philadelphia County, Pennsylvania, on September 11, 2000.  See Otero v. Vito, et al., Case No. 5:04-cv-211, Doc. 362 Ex. F.  Another suit was filed in the Supreme Court of New York, Suffolk County, on October 26, 2000.  Id. Ex. C.  Two cases were filed in Bibb County, Georgia, one in the Superior Court on March 22, 2002, and one in the State Court on September 9, 2003.  Id. Exs. G, H.  In his response to Plaintiff's First Post-Judgment Interrogatories in the underlying case, dated September 7, 2007, Dr. Vito represented that there were five other lawsuits pending against him as of September 4, 2007.  Otero v. Vito, et al., Case No. 5:04-cv-211, Doc. 462 Ex. E ¶ 26.  The record does not provide further detail as to the nature and dates of these suits.  One appears to be his divorce action, filed in the Superior Court of Monroe County in 2006.  Two others appear to have been filed in 2003.

Fourth, the record shows that Dr. Vito transferred substantially all of his assets to his alter ego business entities.  In his first post-judgment interrogatory responses, Dr. Vito represented that he owned no personal property with a value over $25, except "an oil painting of a landscape," of unknown value. See *Otero v. Vito, et al.*, Case No. 5:04-cv-211, Doc. 462 Ex. E ¶ 6. He further stated that he maintained no bank accounts, owned no real estate, no motor vehicles, owned no securities, jewelry, furs, or other assets.  Id. ¶¶ 14, 19, 20, 22.  In a supplemental response to the same interrogatories, dated October 5, 2007, Dr. Vito stated that his net annual income was zero ($0.00) dollars. Id., Ex. J ¶ 7.  In his second supplemental response to those Interrogatories, filed after he was found in contempt of court, Dr. Vito represented that his personal assets were:

1)      Certain furniture located at 181 North Rivoli Farms, including a few selected pieces of furniture, ane (1) piano, and wall hangings;

2)      A pool table which is in storage;

3)      Two (2) pet dogs;

4)      (To the extent that EOI, LLC, is not the owner of a 2007 station wagon,) the 2007 Volvo station wagon on which I am titled as co-owner;

5)      Two (2) annuities/IRA's previously identified in my discovery responses;

6)      Two (2) guns;

7)      Books;

8)      Restricted stock for Small Bone Innovation valued at three thousand ($3,500.00) [*sic*] in 2007;

9)      The money in SunTrust Checking Account No. 1000058644211;

10)     A one hundred (100%) percent interest in Business Solution Professionals, PC, and possibly interests in SEBE, Inc., Georgia Foot & Ankle Society, Medical Shoe Company, LLC, and ASAMI-LE, Inc.; and,

11)     My personal clothing.

17

Doc. 215 Ex. 15 at 17-18. This personal property is of minimal value in contrast to the bulk of real and personal property held in the name of the Vito Entities. EOI, for example, held title to Dr. Vito's personal residence, his office buildings, and six other pieces of real property, along with an annuity/IRA through Lucian Global and three motor vehicles (including the 2007 Volvo station wagon titled in the name of EOI, LLC and George R. Vito). Id. at 12.

Fifth and finally, the evidence shows that Dr. Vito concealed his assets from his creditors and the Court. His assets were partially concealed by the very complexity of this case. They were dispersed among numerous business entities, many of which were purportedly owned or controlled by others. Several of these entities themselves maintained multiple accounts. Some assets were encumbered with obligations through cooperative third parties such as the Lucian Group or City Capital Corporation, to allow Dr. Vito the use and benefit of the assets while denying creditors the ability to attach them.

The assets were concealed not only by the complexity of Dr. Vito's scheme, but also by his refusal to cooperate with the process of discovery under the Federal Rules of Civil Procedure. At the outset of post-judgment discovery in the underlying case, he refused to provide any information at all. His first responses to post-judgment interrogatories and requests for production of documents were brazen in their evasiveness. As a result, Plaintiff was forced to retain a specialist in post-judgment collections, who was subsequently able to uncover much of the scheme through very expensive efforts. Additional information has been obtained in the process of this case, as the Court has gradually applied increasing pressure, beginning with the issuance of an interlocutory injunction and a special master, proceeding to the appointment of the Receiver and a finding of civil contempt. It is not clear that these efforts have been entirely successful in uncovering all of Dr. Vito's assets

or the full nature of his scheme, but enough has been uncovered to permit creditors to obtain a substantial recovery.

This evidence, considered under the factors of O.C.G.A. § 18-2-74(b), is consistent with Dr. Vito's admissions that his intent in creating and operating the various entities was to keep himself insolvent and judgment-proof while maintaining access and control over substantial assets.  He concedes as much in his February 9, 2009 affidavit.  Other evidence presented in this case confirms this intention.  A memorandum prepared by Dr. Vito's accountants indicates that the purpose for creating the GRV Irrevocable Trust was "liability protection," that is "to reduce his litigation exposure in order to minimize medical malpractice premiums."  Pl's M. for Interlocutory Injunction, Doc.103 Ex. 2.  Another doctor testified that Dr. Vito stated in a telephone conversation that he was being sued but had his assets "covered."  Id. Ex. 1.  Most interestingly, perhaps, evidence presented by the Receiver during hearings related to Dr. Vito's civil contempt showed that Dr. Vito regularly presented seminars on behalf of Lucian Global, teaching other physicians how to keep their money "safe from lawsuits or creditors."  Doc. 239 Ex. 3 p. 5.  Among the strategies he discussed were: encumbering business receivables with debt to "make the debt laden assets less attractive to creditors (Id. 11); creating "as many hurdles as possible for potential creditors to jump through," (Id. 12); and "equity stripping," that is, taking out loans against the value of real property and placing the proceeds into an annuity or insurance policy.  (Id. 23).

The record of this case shows that Dr. Vito practiced what he taught, and did so effectively.  He did indeed create as many hurdles as possible for creditors to jump through.  By weaving a complex web of trusts, corporations, and limited liability companies, by channeling his income through numerous accounts in numerous names, by transferring his property to alter egos, by

encumbering his property and income stream with various obligations, and by refusing to cooperate in the discovery of his assets, Dr. Vito fashioned a daunting challenge for his creditors. Overcoming that challenge has required more than two years of arduous, expensive litigation by a very determined Plaintiff, the appointment of a special master and a receiver, the incarceration of Dr. Vito, and considerable time and effort on the part of this Court and its staff. To this day, it cannot be said that the web is completely untangled or that the hurdles have all been removed. Enough is known, however, to warrant summary judgment in the case.

**3.    Conclusion**

The record of evidence in this case shows, beyond any genuine issue of material fact, that the business entities created by Dr. Vito were part of an ongoing scheme of fraudulent transfers. The trusts, corporations, and limited liability companies he created were his alter egos, dummy companies established with the sole and express intent to shelter his assets – which were substantial and growing – from his judgment creditors – who were numerous and multiplying. He transferred all of his real property and almost all of his personal property to these entities, but continued to exercise complete control over that property. He channeled the income from his podiatry practice through the entities and used the funds and accounts of those entities to pay all of his personal expenses. He encumbered the entities and the property with debt and obligations that allowed him to enjoy the benefits of the property while reducing the value of the property to creditors. As a result he was able to preserve his wealth and maintain a lavish lifestyle while completely failing to satisfy the judgments of creditors such as Jay Otero. This scheme must be brought to a conclusion.

Based on the evidence outlined above, the Court finds as a matter of law that the Vito Entities were alter egos of Dr. Vito, part of a complex scheme devised with actual intent to hinder,

delay, or defraud creditors.  The Court further finds that these entities, with the possible exception of Identical Brothers, LLC, had no legitimate business and no income other than through fraudulent transfers from Dr. Vito.  Such fraudulent transfers are voidable pursuant to O.C.G.A. § 18-2-77(a)(1) or through the former O.C.G.A. § 18-2-22(2).

Accordingly, Plaintiff's Motion for Summary Judgment is **GRANTED**, and it is hereby ordered that any property or funds currently held by the Receiver on behalf of the Vito entities, with the exception of Identical Brothers, shall be considered assets of Dr. Vito's estate in bankruptcy.

**SO ORDERED**, this 22nd day of September, 2009.

S/ C. Ashley Royal
C. ASHLEY ROYAL
UNITED STATES DISTRICT COURT

chw